# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### EL PASO

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **V.** | § | **3:15-CR-01851-DCG-01** |
| | § | |
| | § | |
| **KATY LYNN FORD** | § | |

## KATY LYNN FORD'S EMERGENCY MOTION FOR SENTENCE REDUCTION PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

TO THE HONORABLE DAVID C. GUADERRAMA, UNITED STATES DISTRICT JUDGE IN THE WESTERN DISTRICT OF TEXAS:

Katy Lynn Ford respectfully moves this Court, under 18 U.S.C. § 3582(c)(1)(A), to reduce her sentence to time-served or, alternatively, to modify her judgment to allow her to serve a portion of her sentence on home confinement.[1] She makes this request based on the "extraordinary and compelling reasons" presented by the COVID-19 pandemic and her vulnerability to infection. Specifically, Ms. Ford is at a higher risk of contracting COVID-19 and experiencing severe illness and/or death due to her incarceration at Carswell FMC, which has experienced a severe COVID-19 outbreak, and her underlying health conditions which include: type 2 diabetes, hypertension, obesity, and a history of hepatitis C. Because Ms. Ford's continued incarceration places her, her fellow inmates, and staff at Carswell FMC at significant risk, she asks the Court to consider this motion on an expedited basis.

---

[1] This motion is not brought under the home confinement provisions of Section 12003 of the CARES Act, but rather pursuant to § 3582(c)(1)(A) which permits the Court to reduce a sentence and modify the terms of supervised release, *See, e.g. United States v. Coker*, No. 3:14-CR-085 (RLJ), 2020 WL 1877800 (E.D. Tenn. Apr. 15, 2020) (ordering the defendant be sentenced to time-served and modifying conditions of supervised release to include a term of home confinement).

**Introduction**

Ms. Ford is 37 years old and suffers from serious medical conditions, which make her uniquely susceptible to COVID-19, including: type 2 diabetes, hypertension, obesity, and a history of hepatitis C. According to the CDC and other experts, these conditions make her more likely to suffer severe illness or death as a result of COVID-19.[2] Around the country, including in the Western District of Texas, her reported conditions have served as grounds for sentence reductions during the COVID-19 crisis.

For a person suffering from health conditions like Ms. Ford, there are few more dangerous places to be during this pandemic than an American prison.[3] To date, there have been 141 inmate deaths and two staff deaths attributed to COVID-19 in the BOP system.[4] The majority of those inmates were, like Ms. Ford, noted to have "long-term, pre-existing medical conditions, which the CDC lists as risk factors for developing more severe COVID-19[.]"[5] And while the mere fact of her incarceration puts Ms. Ford at significant risk, she faces the added threat of being housed at Carswell FMC, which recently experienced a massive COVID-19 outbreak and has been the subject of numerous reports of inadequate medical care and other practices inconsistent with

---

[2] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html. (last visited Oct. 26, 2020).

[3] Michael Balsamo, *Over 70 percent of tested inmates in federal prisons have COVID-19* (Apr. 29, 2020), https://www.pbs.org/newshour/nation/over-70-of-tested-inmates-in-federal-prisons-have-covid-19. This estimate is consistent with state prisons and jails. EQUAL JUSTICE INITIATIVE, *Covid-19's Impact on People in Prison* (updated Aug. 21, 2020), https://eji.org/news/covid-19s-impact-on-people-in-prison/ (last visited Oct. 26, 2020)

[4] FEDERAL BUREAU OF PRISONS, *COVID-19 Update*, https://www.bop.gov/coronavirus/ (last visited Nov. 18, 2020).

[5] FEDERAL BUREAU OF PRISONS, *Press Releases*, https://www.bop.gov/resources/press_releases.jsp (last visited Nov. 18, 2020).

slowing the spread of the virus. In total, Carswell has reported 519 infected inmates, 4 infected staff members, and 6 inmate deaths as a result of the virus.[6]

Ms. Ford has served over 5 years, or roughly 60% of her expected sentence, for a non-violent drug offense. She is serving a 120-month sentence and is expected to be released in April 2024, with good time credit. While incarcerated, Ms. Ford has undergone significant rehabilitation; she has participated in extensive programming, has received positive evaluations from her work supervisor, has maintained clear disciplinary conduct for the majority of her time in prison, has renewed her religious faith, and is designated a minimum security level. Before the present offense, Ms. Ford struggled for years with addiction. She has used her time in prison to learn about substance abuse and remain clean and sober. Based on her health issues and her significant rehabilitative efforts, she would pose no danger to the community if released.

Upon reentry, Ms. Ford can quarantine and live with her mother, Angela Youngblood, who has a stable home in Harrison, Arkansas. She will be close to family who can support her and has already been working with them to identify potential employment opportunities if she is released. In the past six months, courts around the country have granted compassionate release to many inmates—including to those who, like Ms. Ford, suffer from CDC recognized health conditions and have served significant sentences for non-violent crimes. As an at-risk inmate who is deemed a minimum security level and has served a significant majority of her sentence for a non-violent crime, Ms. Ford likely should have already been released under Attorney General Barr's guidance.[7] This Court should order Ms. Ford immediate release, in light of the significant and avoidable risks she faces otherwise.

---

[6] FEDERAL BUREAU OF PRISONS, *COVID-19 Update*, https://www.bop.gov/coronavirus/ (last visited Nov. 19, 2020).

[7] *See* William Barr, United States Attorney General, *Memorandum for Director of Bureau of Prisons* (Mar. 26, 2020), available at https://www.justice.gov/file/1262731/download; William Barr, United States Attorney General,

## II. Background

### A. Procedural Background

On September 29, 2015, Ms. Ford was arrested for importing and possessing with intent to distribute approximately 40.42 kilograms of liquid methamphetamine. *See* Doc. No. 1. On December 22, 2015, Ms. Ford pleaded guilty to one count of importation of methamphetamine. *See* Doc. No. 25. The United States Probation Office calculated a Sentencing Guidelines' term of imprisonment of 240 months, the statutory maximum sentence for her offense. *See* PSR, Doc. No. 31 at ¶ 60. The Government, however, filed a Sentencing Memorandum on Ms. Ford's behalf, arguing the recommended sentence was disproportionately high because of Ms. Ford's minimal role in the offense and her sincere attempts to assist the Government in pursuing other offenders. *See* Doc No. 33. On March 10, 2016, the Court sentenced Ms. Ford to a term of 120 months' incarceration. Doc. No. 35.

Ms. Ford has been in custody since her arrest on September 29, 2015. In July of 2020, in light of her significant medical conditions and growing concerns about the spread of COVID-19 throughout the BOP system, Ms. Ford submitted a request for compassionate release to the Warden at Carswell FMC. On August 2, 2020, the Warden denied that request. *See* Exhibit 3. On August 17, 2020, Ms. Ford requested reconsideration of that decision, and the Warden again denied on September 11, 2020. *See* Exhibit 3. On September 21, 2020, Ms. Ford appealed the denial of her compassionate release request to the BOP Regional Director. *See* Exhibit 3. She has not yet received a response regarding her appear. Ms. Ford now moves this Court for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(a).

---

*Memorandum for Director of Bureau of Prisons* (Apr. 3, 2020), available at https://www.justice.gov/file/1266661/download.

### B. The Impact of COVID-19 on the Federal Bureau of Prisons

The world has changed dramatically in the past few months because of the COVID-19 pandemic. As of November 18, 2020, over 56 million people have been infected globally and over 1.3 million people have died. In the United States alone, over 11.5 million people have been infected and nearly 255,000 people have died.[8]

Public health experts have warned that incarcerated individuals "are at special risk of infection" and are "less able to participate in proactive measures to keep themselves safe."[9] The conditions in BOP facilities provide a uniquely hospitable environment for COVID-19 to spread.[10] Inmates must share communal living spaces, such as cells, restrooms, recreation rooms, dining halls, libraries, and exercise yards. To make matters worse, hand sanitizer, an effective disinfectant recommended by the CDC to reduce transmission, is deemed forbidden "contraband" in BOP facilities because of its alcohol content.[11] Recognizing the unique risks that correctional facilities pose to both inmates and employees, Attorney General Barr has twice urged the Director of the BOP to prioritize home confinement for inmates who are elderly, housed in low- or minimum-security facilities, and/or otherwise vulnerable or eligible.[12]

---

[8] WORLDOMETER, *COVID-19 Coronavirus Pandemic*, available at https://www.worldometers.info/coronavirus (last visited Nov. 18, 2020).

[9] *Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States* (March 2, 2020), at https://bit.ly/2W9V6oS.

[10] Joseph A. Bick, *Infection Control in Jails and Prisons*, CLINICAL INFECTIOUS DISEASES 45(8): 1047-1055 (2007), available at https://doi.org/10.1086/521910; VICE, *Sick Staff, Inmate Transfers, and No Tests: How the U.S. is Failing Federal Inmates as Coronavirus Hits*,(Mar. 24, 2020), available at https://www.vice.com/en_us/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits.

[11] Keri Blakinger and Beth Schwarzapfel, *How Can Prisons Contain Coronavirus When Purell is Contraband?,* ABA JOURNAL (March 13, 2020), available at *https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus*.

[12] William Barr, United States Attorney General, *Memorandum for Director of Bureau of Prisons* (Mar. 26, 2020), available at https://www.justice.gov/file/1262731/download; William Barr, United States Attorney General, *Memorandum for Director of Bureau of Prisons* (Apr. 3, 2020), available at https://www.justice.gov/file/1266661/download.

Despite the BOP's efforts to take precautionary measures, they are unprepared to contain the virus's spread.[13] FMC Carswell has been among those BOP facilities most adversely affected by the pandemic. As of November 18, 2020, Carswell has reported 519 infected inmates, 4 infected staff members, and 6 inmate deaths as a result of the virus.[14] The conditions reported in the past six months make clear that such an outbreak was predictable. At FMC Carswell, prisoners sleep four—even nine—to a cell and less than three feet apart.[15] Prisoners also wear the same disposable mask every day while others, including staff, do not wear one at all.[16] Heavily used telephones are not regularly sanitized.[17] Prisoners with fevers go untested for coronavirus.[18] The facility has run out of hand sanitizer.[19] Officers move between quarantined and non-quarantined cells, potentially spreading the virus to high-risk individuals.[20] On April 7, 2020, "FMC Carswell's officer union

---

[13] *See e.g.,* Luke Barr, *Bureau of Prisons coronavirus response under fire: 'Reactive,' not 'proactive,' inmates, staff say* (Apr. 10, 2020), https://abcnews.go.com/Health/bureau-prisons-coronavirus-response-fire-reactive-proactive-inmates/story?id=70063263. Numerous facilities have also acknowledged limited or no testing capability for COVID-19. *See e.g.,* James Hill and Luke Barr, *No COVID-19 tests available for prisoners at center of New York outbreak, court documents show,* (Apr. 4, 2020), https://abcnews.go.com/Health/covid-19-tests-prisoners-center-york-outbreak-court/story?id=69969077 (According to the warden of the Metropolitan Correctional Center in New York City, "MCC New York does not have COVID-19 tests[.]"); Kimberly Kindy, *Inside the deadliest federal prison, the seeping coronavirus creates fear and danger,* THE WASHINGTON POST (Apr. 10, 2020), https://www.washingtonpost.com/national/inside-the-deadliest-federal-prison-the-seeping-coronavirus-creates-fear-and-danger/2020/04/09/deeceb6e-75b4-11ea-a9bd-9f8b593300d0_story (Bureau officials acknowledge that, for FCI Oakdale, "only those ill enough to be taken to a hospital are tested for the coronavirus.").

[14] FEDERAL BUREAU OF PRISONS, *COVID-19 Update,* https://www.bop.gov/coronavirus/ (last visited Nov. 18, 2020).

[15] Mark Dent, *Sick, elderly and fearing coronavirus: Life inside Fort Worth's women's federal prison,* FORT WORTH STAR-TELEGRAM (Apr. 20, 2020), https://www.star-telegram.com/news/special-reports/article242042671.html; Christopher Connelly, *'We're All Really Scared': Life In Federal Lockup During COVID-19,* TEXAS STANDARD (Apr. 13, 2020), https://www.texasstandard.org/stories/were-all-really-scared-life-in-federal-lockup-during-covid-19/ (citing KERA National Public Radio, https://www.keranews.org/post/were-all-really-scared-life-federal-lockup-remains-uncertain-during-covid-19-outbreak).

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] R. Robin McDonald, *Chief Judge Refuses to Expedite Hearing to Release Reality Winner from Prison Where 2 Inmates Have COVID-19,* LAW.COM DAILY REPORT (Apr. 17, 2020), https://www.law.com/dailyreportonline/2020/04/17/chief-judge-slow-walks-hearing-to-release-reality-winner-from-prison-where-2-inmates-have-covid-19/.

[20] *Id.*

filed a whistleblower complaint through a letter to U.S. Sen. John Cornyn of Texas."[21] According to the officer union, "[t]here has not been any guidance given to all staff as far as processes and procedures in maintaining health and safety."[22] Over the course of the month of July, FMC Carswell went from having two inmates who had tested positive for COVID-19 to over 500.[23] Since then, 6 women have died as a result of the virus, and, even to this day, the facility continues to identify newly infected inmates and staff members.

       None of this surprises doctors and epidemiologists. Prisons "have long been known to be associated with high transmission" of infectious diseases like "tuberculosis, multi-drug resistant tuberculosis, MRSA, and viral hepatitis,"[24] says Dr. Chris Beyrer, a medical doctor and epidemiologist at Johns Hopkins working on the pandemic response.[25] The virus is 5-to-35 times more deadly than influenza, and one-in-five infected will require medical intervention.[26] The BOP cannot hospitalize 20% of the inmate population. And a new epidemiological model predicts

---

[21] Kaley Johnson, *Whistleblower warned of conditions at Fort Worth prison before woman died of coronavirus* (May 1, 2020), https://www.star-telegram.com/news/local/crime/article242405771.html (last visited May 13, 2020).

[22] *Id.*

[23] BOP COVID-19 Resource Page (updated daily), https://www.bop.gov/coronavirus/ (last accessed Oct. 23, 2020) (documenting the recent spike in inmate COVID-19 cases at FMC Carswell); Journal of Emergency Medical, *More than 500 Women Contract COVID-19 at TX Federal Prison*, (Jul. 22,2020), available at: https://www.jems.com/2020/07/22/more-than-500-women-contract-covid-19-tx-prison/ .

[24] Chris Beyrer, MD, MPH, *Declaration of Chris Beyrer*, ACLU MARYLAND, at ¶ 11 (Apr. 5, 2020), available at: https://www.aclu-md.org/sites/default/files/field_documents/ex_d_-_beyrer_declaration_final.pdf. ("Beyrer Decl.").

[25] *See also* Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases, 1047, 1047 (2007) (available at: https://doi.org/10.1086/521910); CENTERS FOR DISEASE CONTROL AND PREVENTION, *Interim Guidance on Mgmt. of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020) (available at: https://bit.ly/2VufGhP) ("There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress.").

[26] Beyrer Decl. ¶ 5.

"COVID-19 could claim the lives of approximately 100,000 more people than current projections stipulate if jail populations are not dramatically and immediately reduced[.]"[27]

As this alarming crisis continues to unfold, the universally recommended antidote is to reduce the prison population.

## II. Argument

The First Step Act empowers Courts to reduce a defendant's sentence upon his or her motion for compassionate release. 18 U.S.C. § 3582(c)(1)(A)(i). While compassionate release motions could previously only be brought by the Director of the Bureau of Prisons, the Act enabled defendants to seek relief on their own behalf.[28]

Under § 3582(c)(1)(A), a court can reduce a sentence when: 1) the inmate has exhausted his or her remedies or 30 days have passed since receipt of the inmate's request by the Warden; 2) "extraordinary and compelling reasons" warrant the reduction; 3) the Court has considered the factors set forth in § 3553(a); and 4) such a reduction is "consistent with applicable policy statements issues by the Sentencing Commission.

### A. Ms. Ford has satisfied the exhaustion requirement outlined in 18 U.S.C. § 3582(c)(1)(A).

Under 18 U.S.C. § 3582(c)(1)(A), a defendant ordinarily must exhaust administrative remedies with the BOP or wait until 30 days have passed since the warden received his or her

---

[27] ACLU, *Failure to reduce jail population is the Achilles heel for the efforts to mitigate the spread of COVID-19 in the U.S.* (Apr. 22, 2020), https://www.aclu.org/press-releases/new-model-shows-covid-19-death-toll-100000-higher-current-projections.

[28] *See, e.g.*, *United States v. Cantu* 423 F. Supp. 3d 345, 349-50 (S.D. Tex. June 17, 2019) (vesting BOP with authority to determine whether extraordinary and compelling reasons are present "no longer describes an appropriate use of sentence-modification provisions and is thus not part of the applicable policy statement binding the Court"); *United States v. Ebbers*, 432 F. Supp. 3d 421, 427 n.6 (S.D.N.Y. Jan. 8, 2020) ("[T]he First Step Act reduced the BOP's control over compassionate release and vested greater discretion with courts. Deferring to the BOP would seem to frustrate that purpose.").

request for compassionate release to the warden, whichever comes first. 18 U.S.C. § 3582(c)(1)(A).

Ms. Ford has satisfied the exhaustion requirements. Ms. Ford submitted her initial request for compassionate release to the Warden in July 2020. That request was denied, and she has continued to follow BOP's administrative process. *See* Exhibit 3. Now that more than 30 days have passed since BOP received Ms. Ford's request, this motion is ripe for consideration.[29]

## B. Ms. Ford has shown that extraordinary and compelling circumstances warrant compassionate release.

Although the Sentencing Guidelines have not been updated to reflect the changes created by the First Step Act, or COVID-19, they provide some guidance on what "extraordinary and compelling" reasons entail. These include: suffering from a terminal illness (including end-stage organ disease); "suffering from a serious physical or medical condition … that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover;" or "other reasons," found to be "extraordinary and compelling." U.S.S.G. §1B1.13, comment. n.1(A)(i), (A)(ii)(I), (D).

Since the First Step Act took effect, courts have embraced their broad discretion under § 3582(c)(1)(A) to grant compassionate release, and have found "extraordinary and compelling reasons" to do so in circumstances beyond the few (age, medical condition, and family needs) the

---

[29] Counsel is aware that the Government has adopted strikingly disparate postures with respect to the exhaustion requirement around the country, a practice, which has been lambasted by numerous district courts. *See, e.g. United States v. Fischman*, No. 4:16-cr-246, 2020 WL 2097615 (N.D. Cal. May 1, 2020) ("The Court has serious concerns that the government's apparent case-by-case approach to its position on the legal question of exhaustion results in arbitrary differences in the treatment of similarly-situated defendants. The government's interpretation of § 3582(c) should not change based on whether an inmate is incarcerated in New York or California."); *United States v. McIndoo*, --- F. Supp. 3d ---, 2020 WL 2201970 (W.D.N.Y. May 6, 2020) ("By insisting, in the face of a once-in-a-century pandemic, on opposing motions for compassionate release on technical grounds, the Government has helped create a fundamentally unjust, chaotic system in which an inmate's opportunity to even have his motion heard depends on the judge or prosecutor who is assigned to his case."). Nevertheless, Ms. Ford has undoubtedly satisfied the requirements here and counsel does not anticipate opposition by the Government on this point.

BOP traditionally relied on or are listed in §1B1.13.[30] "[I]f a compassionate release motion is not brought by the BOP Director, Guideline § 1B1.13 does not, by its own terms, apply to it." *United States v. Brooker,* 976 F.3d 228, 236 (2d Cir. Sept. 25, 2020). "[T]he only statutory limit on what a court may consider to be extraordinary and compelling is that rehabilitation...alone shall not be considered an extraordinary and compelling reason."' *Id.* at 237-38. "While Sentencing Commission and BOP criteria remain helpful guidance, the amended [compassionate-release statute] vests courts with independent discretion to determine whether there are 'extraordinary and compelling reasons' to reduce a sentence." *United States v. Decator*, 452 F. Supp. 3d 320, 324 (D. Md. Apr. 6, 2020); *see also United States v. Maumau*, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at *2 (D. Utah Feb. 18, 2020) (collecting cases and joining the majority of district courts to find the court is not bound to the outdated policy statement).[31]

Since the onset of the pandemic, courts have uniformly recognized that the effects of COVID-19 on prison populations is a significant consideration when assessing whether "extraordinary and compelling reasons" support compassionate release. *See, e.g. United States v. Resnick*, 451 F. Supp. 3d 262, 270 (S.D.N.Y. Apr. 2, 2020) (detailing the impact of COVID-19 on

---

[30] *See United States v. Muniz*, No. 4:09-CR-199-1, 2020 WL 1540325, at *1 (S.D. Tex. Mar. 30, 2020); *United States v. Owens*, No. 97-CR-2546-CAB, Doc. No. 93 at 4 (S.D. Cal. Mar. 20, 2020); *United States v. Redd*, No. 1:97-CR-0006-AJT, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020); *United States v. Perez*, No. 88-CR-10094-JTM, 2020 WL 1180719, at *2 (D. Kan. Mar. 11, 2020); *United States v. Young*, No. 2:00-CR-0002-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020); *United States v. O'Bryan*, No. 96-CR-10076-JTM-03, 2020 WL 869475, at *2 (D. Kan. Feb. 21, 2020); *United States v. Schmitt*, No. 12-CR-4076-LTS, 2020 WL 96904, at *3 (N.D. Iowa Jan. 8. 2020); *United States v. Valdez*, No. 3:98-CR-0133-01-HRH, 2019 WL 7373023, at *2 (D. Alaska Dec. 31, 2019); *United States v. Rodriguez*, No. 17-CR-00021-WHO-1, 2019 WL 6311388, at *7 (N.D. Cal. Nov. 25, 2019); *United States v. Urkevich*, No. 8:03-CR-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019); *United States v. Walker*, No. 1:11-CR-270, 2019 WL 5268752, at *2 (N.D. Ohio Oct. 17, 2019); *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *5-6, 8-9 (M.D.N.C. June 28, 2019); *United States v. Cantu-Rivera*, No. H-89-CR-204, 2019 WL 2578272, at *2 n.1 (S.D. Tex. June 24, 2019); *United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *5 (S.D. Tex. June 17, 2019).

[31] "[A] majority of district courts have concluded that the 'old policy statement provides helpful guidance, [but] … does not constrain [a court's] independent assessment of whether "extraordinary and compelling reasons" warrant a sentence reduction under § 3582(c)(1)(A)." *United States v. Rodriguez*, 451 F. Supp. 3d 392, 397 (E.D. Pa. Apr. 1, 2020) (citing *United States v. Beck*, 425 F. Supp. 3d 573 (M.D.N.C. June 28, 2019).

the BOP and finding "[r]eleasing a prisoner who is for all practical purposes deserving of compassionate release during normal times is all but mandated in the age of COVID-19."). Well over 1,000 inmates have been released because of the risks posed by the COVID-19 pandemic, a dramatic increase from prior years.[32] Courts around the country have granted compassionate release, even to seemingly healthy inmates, because the conditions have grown so worrisome at certain BOP facilities. *See, e.g. United States v. Kelly*, No. 3:13-CR-59 (CWR-LRA), 2020 WL 2104241 (S.D. Miss. May 1, 2020) (granting compassionate release to a young otherwise healthy inmate based on the horrific conditions at FCC Oakdale). The mere presence of the COVID-19 pandemic and the horrors it has wrought on the prison population, justify compassionate release of inmates on an overarching systemic level. Prison populations have experienced infection rates much higher than those in the general public. Congress, the President, and the Attorney General have all directed the BOP to identify inmates for home confinement or early release, to stymie the spread of the virus. It is a simple fact the current circumstances are extraordinary, and that BOP must reduce the prison population to respond to the pandemic and care for its inmate population.

1. *Ms. Ford has satisfied the threshold for "extraordinary and compelling" because her numerous medical conditions place her at significant risk while in BOP custody.*

Ms. Ford's medical conditions constitute "extraordinary and compelling reasons," under the Sentencing Guidelines catchall provision at U.S.S.G. §1B1.13, comment. n.1(D), or based on this Court's substantial discretion to define what justifies compassionate release. In light of the COVID-19 pandemic, Ms. Ford faces a grave risk of serious illness or even death if she is exposed

---

[32] *See* Keri Blakinger and Joseph Neff, *Thousands of Sick Federal Prisoners Sought Compassionate Release. 98 Percent Were Denied*, THE MARSHALL PROJECT (Oct. 7, 2020), https://www.themarshallproject.org/2020/10/07/thousands-of-sick-federal-prisoners-sought-compassionate-release-98-percent-were-denied (noting that roughly 1,600 prisoners have been granted compassionate release in 2020).

to the virus because she suffers from types 2 diabetes, hypertension, obesity, and a history of hepatitis C. *See* Exhibit 1, BOP Medical Records.

   ***Outbreak at FMC Carswell.*** Courts around the country, including in this district, have used the severity of a COVID-19 outbreak at a given facility as among the relevant factors in considering whether extraordinary and compelling reasons support a sentence reduction. *See, e.g., United States v. Madrid*, No. 5:08-CR-0890-XR, Doc. 279 (W.D.T.X. May 18, 2020) (finding that defendant had established an "extraordinary and compelling reason" for release and noting "[g]iven the severity of his medical conditions continued placement at Ft. Worth FMC is problematic given the outbreak of COVID-19 cases at that facility."). At least one district court in the Fifth Circuit, has determined that the pandemic and BOP's inadequate response at a severely infected facility justify compassionate release of any inmate, regardless of the inmate's age or the absence of any underlying medical conditions. *See United States v. Kelly*, No. 3:13-CR-59 (CWR-LRA), 2020 WL 2104241 (S.D. Miss. May 1, 2020). In *Kelly*, the court granted compassionate release to a defendant in his twenties with no underlying medical conditions, finding "[g]iven the steadily growing death toll and the apparent continued spread of the disease at Oakdale I, COVID-19 creates an 'extraordinary and compelling reason' potentially warranting a reduced sentence." *Id*. at \*8. Ms. Ford is housed at Carswell FMC, which has reported roughly twice as many infected inmates as Oakdale FCC and, unlike Mr. Kelly, she suffers from numerous conditions, which place her at more risk to COVID-19 than Mr. Kelly. Still, she remains incarcerated. Ms. Ford herself has already had to quarantine at least once when it was believed that her roommate had contracted the virus. *See* Exhibit 1, BOP Medical Records at 3-10. Fortunately, she was not infected at the time, but she remains at considerable risk.

***Type 2 Diabetes.*** Ms. Ford's type 2 diabetes diagnosis is perhaps the greatest concern during the COVID-19 pandemic. Diabetes is among those conditions identified by the CDC as placing people at a high-risk for serious illness from COVID-19.[33] The disease suppresses the body's ability to fight off infections, compromising the immune system.[34] A study published on April 22, 2020 in the Journal of the American Medical Association found, "Of the patients who died, those with diabetes were more likely to have received invasive mechanical ventilation or care in the ICU compared with those who did not have diabetes."[35] And, "[t]he percentage of patients who developed acute kidney injury was increased in the subgroups with diabetes compared with the subgroups without these conditions."[36] One court has found that for a diabetic inmate, "nothing could be more extraordinary and compelling than this pandemic."[37] Early research shows that diabetes patients have mortality rates that are more than twice as high as overall mortality rates from COVID-19.[38] According to one recent study, one in ten coronavirus patients with diabetes dies within a week of hospitalization.[39] Consequently, courts around the country, including in this

---

[33] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Coronavirus Disease 2029 (COVID-19): People Who Are At Higher Risk*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited Oct. 23, 2020).

[34] *See* Maria Lally, *Coronavirus: how diabetics, asthma and other underlying illnesses affect how you cope*, THE TELEGRAPH (May 17, 2020), https://www.telegraph.co.uk/health-fitness/body/coronavirus-diabetes-underlying-health-conditions-asthma-heart/; Claire Gillespie, *If You're Immunocompromised, You Are at a Higher Risk of Coronavirus—Here's What That Means*, HEALTH.COM (Mar. 11, 2020), https://www.health.com/condition/infectious-diseases/what-is-immunocompromised.

[35] Safiya Richardson, MD, MPH, et al., *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized with COVID-19 in the New York City Area*, JAMA NETWORK (Apr. 22, 2020), https://jamanetwork.com/journals/jama/fullarticle/2765184.

[36] *Id.*

[37] *United States v. Rodriguez*, 451 F. Supp. 3d 392, 394 (E.D. Pa. Apr. 1, 2020).

[38] *Id.* (citing Tom Avril, *How much diabetes, smoking, and other risk factors worsen your coronavirus odds*, PHILADELPHIA INQUIRER (Mar. 31, 2020), https://www.inquirer.com/health/corona-virus/coronavirus-underlying-conditions-heart-lung-kidney-cdc-20200331.html).

[39] Shelby Lin Erdman, *One in 10 Covid-19 patients with diabetes die within a week, study finds*, CNN (May 30, 2020), https://www.cnn.com/2020/05/29/health/diabetes-study-covid-19-deaths/index.html

district, have found diabetes to be among the most compelling existing conditions that justifies compassionate release during the pandemic.[40] Numerous have even noted that diabetes, even absent other medical conditions, constitutes "extraordinary and compelling" reason for release in light of the pandemic.[41]

*Hypertension.* Additionally, Ms. Ford's high blood pressure (hypertension) diagnosis present significant risks if she is exposed to COVID-19. *See* Exhibit 1, BOP Medical Records at 16. The state of New York, which has the most robust data set on the subject, recently released a report on the most dangerous and frequent comorbidities occurring with COVID-19-related fatalities.[42] Hypertension was identified as the top comorbidity. The CDC and other experts have also recognized that adults with hypertension may be at increased risk of severe illness from

---

[40] *See, e.g. United States v. Ennis*, EP-02-CR-1430-PRM-1, 2020 WL 2513109 (W.D. Tex. May 14, 2020) (granting compassionate release to a defendant with diabetes, asthma, hypertension, hyperlipidemia, arthritis, and hypothyroidism);*United States v. Amarrah*, 459 F. Supp. 3d 611 (E.D. Mich. May 7, 2020) (granting compassionate release to inmate suffering from diabetes, hypertensive heart disease, cardiac arrhythmia, sleep apnea, and asthma.); *United States v. Rivera*, No. 86-CR-1124, 2020 WL 2094094 (S.D.N.Y. May 1, 2020) (granting compassionate release pursuant to F.R.C.P. 35(b) in light of COVID-19 and underlying health condition of diabetes); *United States v. Lacy*, No. 15-CR-30038-SEM, 2020 WL 2093363 (C.D. Ill. May 1, 2020) (granting compassionate release in light of COVID-19 and underlying health conditions of diabetes, hypertension, and obesity); *United States v. Bertrand*, No. 3:00-CR-12, 2020 WL 2179387 (N.D. Fla. Apr. 29, 2020) (granting compassionate release in light of COVID-19 and multiple serious health conditions, including diabetes, pulmonary embolism, chronic kidney disease, asthma, and hypertension); *United States v. Ben-Yhwh*, 453 F. Supp. 3d 1324 (D. Hawaii Apr. 13, 2020) (granting compassionate release in light of COVID-19 and underlying health conditions of asthma, high blood pressure, diabetes); *United States v. Zukerman*, 451 F. Supp. 3d 329 (S.D.N.Y. Apr. 3, 2020) (releasing defendant because his diabetes, hypertension, and obesity increase her risk of severe ill-ness if he contracts COVID-19); *United States v. Colvin*, 451 F. Supp. 3d 237 (D. Conn. Apr. 2, 2020) (releasing defendant because her diabetes and hypertension increase her risk of severe illness if she contracts COVID-19); *United States v. Rodriguez*, 451 F. Supp. 3d 392 (E.D. Pa. Apr. 1, 2020) (releasing defendant because his diabetes, high blood pressure, and liver abnormalities increase his risk of severe illness if he contracts COVID-19); *United States v. Resnick*, 451 F. Supp. 3d 262 (S.D.N.Y. Apr. 2, 2020) (releasing defendant in light of COVID-19 and his diabetes and end-stage liver disease).

[41] *See United States v. Colvin*, 451 F. Supp. 3d 237 (D. Conn. Apr. 2, 2020) (granting compassionate release on the basis of defendant's diabetes); *Lacy*, 2020 WL 2093363, at *6; *see also Ennis*, EP-02-CR-1430-PRM-1, 2020 WL 2513109, at *6 n.9 ("The Court notes that the Government…concedes that Defendant's diabetes, in conjunction with the risk of COVID-19, may satisfy Application Note 1(A)'s standard for 'extraordinary and compelling reasons' warranting relief.").

[42] NEW YORK STATE DEPARTMENT OF HEALTH, *COVID-19 Tracker*, available at https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no (last visited Oct. 26, 2020).

COVID-19.[43] [44] Accordingly, hypertension has been among of the most common grounds for compassionate release during the COVID-19 pandemic.[45]

*Obesity.* The risks associated with Ms. Ford's medical conditions are also significantly exacerbated by her current weight. Ms. Ford's weight has fluctuated during her incarceration, and medical records from August 2020 suggest that she had recently lost weight and lowered her BMI from 40 to 37. *See* Exhibit 1, BOP Medical Records at 1, 13-16. Her most recently recorded weight, however, was 292 lbs. in May 2020, which, at a height of 6 feet, would equate to a BMI of 39.6. *See* Exhibit 1, BOP Medical Records at 1. A BMI greater than 30 qualifies as obese, and a BMI greater than 40 is classified as morbid obesity.[46] Morbid obesity is a serious health condition that

---

[43] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Coronavirus Disease 2019: People with Certain Medical Conditions*, (updated Oct. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html.

[44] *See* Dara K. Lee Lewis, MD, *How does cardiovascular disease increase the risk of severe illness and death from COVID-19?*, Harvard Health (Apr. 2, 2020), https://www.health.harvard.edu/blog/how-does-cardiovascular-disease-increase-the-risk-of-severe-illness-and-death-from-covid-19-2020040219401 ("Increased risk [of death] has also been seen in people with high blood pressure (hypertension) and coronary artery disease (CAD), though it is not clear why."); Lei Fang, George Karakiulakis, and Michael Roth, *Are patients with hypertension and diabetes mellitus at increased risk for COVID-19 infection*, THE LANCET, https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30116-8/fulltext#seccestitle10 (Mar. 11, 2020) (finding hypertension as a significant comorbidity to COVID-19 and hypothesizing that certain treatments for hypertension might contribute to that fact); Jessica Ferguson et al., *Characteristics and Outcomes of Coronavirus Disease Patients under Nonsurge Conditions, Northern California, USA, March–April 2020*, CENTERS FOR DISEASE CONTROL AND PREVENTION (May 14, 2020), https://wwwnc.cdc.gov/eid/article/26/8/20-1776_article; Dave DeCapprio et al., *Building a COVID-19 Vulnerability Index*, MEDRXIV (Mar. 23, 2020), https://www.medrxiv.org/content/medrxiv/early/2020/03/30/2020.03.16.20036723.full.pdf; *see also* Ryan Prior, *Those with high blood pressure are at a greater risk for Covid-19*, CNN (Apr. 17, 2020), https://www.cnn.com/2020/04/17/health/blood-pressure-coronavirus-wellness/index.html.

[45] *See*, *e.g.*, *United States v. Joling*, --- F. Supp. 3d ---, 2020 WL 1903280, at *4 (D. Or. April 17, 2020); *United States v. Hammond*, No. 2-CR-294-BAH, 2020 WL 1891980, *8 (D.D.C. April 16, 2020); *United States v. Zukerman*, 451-F. Supp. 4d 329, 334-36 (S.D.N.Y. Apr. 3, 2020). Some courts have even found that hypertension alone may constitute an extraordinary and compelling reason for a reduction in sentence during this pandemic. *See United States v. Sawicz*, 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020); *United States v. Lacy*, No. 15-CR-30038-SEM, 2020 WL 2093363, at *6 (C.D. Ill. May 1, 2020) ("Besides obesity, Defendant suffers from hypertension and diabetes…Any one of these three factors alone would increase the serious risks of COVID-19[.]").

[46] UNIVERSITY OF ROCHESTER MEDICAL CENTER, *What is Morbid Obesity*, available at: https://www.urmc.rochester.edu/highland/bariatric-surgery-center/journey/morbid-obesity.aspx#:~:text=Normal%20BMI%20ranges%20from%2020,high%20blood%20pressure%20or%20diabetes, (last visited Oct. 26, 2020).

15

puts individuals at greater risk for numerous complications including diabetes, high blood pressure, sleep apnea, cancer, and heart disease.[47] Studies have shown that severely obese individuals are roughly twice as likely to die from COVID-19 as those who are not obese, with that risk growing even greater with higher degrees of obesity.[48] On August 10, 2020, the CDC published findings that those suffering from severe obesity are 4.5 times more likely to be hospitalized if they contract COVID-19 than healthy individuals.[49] Experts have noted several reasons why obesity exacerbates the effects of COVID-19, including that: obesity restricts ventilation by impeding diaphragm excursion[50] resulting in lower oxygen levels and a higher risk of pulmonary dysfunction,[51] and it impairs the immune system's responses to viral infection.[52] After numerous studies demonstrating these risks, the CDC recently updated this list of conditions on July 17, 2020, and identified obesity as among those conditions for which there is the "strongest and most consistent evidence" of increased risk during the COVID-19 pandemic.[53] Courts,

---

[47] *Id.*

[48] Elizabeth J. Williamson, et al. *Factors associated with COVID-19-related death using OpenSAFELY,* NATURE (Jul. 8, 2020), available at https://www.nature.com/articles/s41586-020-2521-4_reference.pdf?referringSource=articleShare.

[49] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Hospitalization Related to Underlying Medical Conditions* (updated Aug. 10, 2020), available at: https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-underlying-medical-conditions.html.

[50] David A. Kass et al., *Obesity could shift severe COVID-19 diseases to younger ages*, THE LANCET (May 4, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)31024-2/fulltext.

[51] *See* Dawn Fallik, *COVID-19 is hitting some patients with obesity particularly hard*, SCIENCE NEWS (Apr. 22, 2020), https://www.sciencenews.org/article/coronavirus-covid19-obesity-risk-factor.

[52] *See* David A. Kass et al., *Obesity could shift severe COVID-19 diseases to younger ages*, THE LANCET (May 4, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)31024-2/fulltext.

[53] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Coronavirus Disease 2019 (COVID-19): Evidence used to update the list of underlying medical conditions that increase a person's risk of severe illness from COVID-19*, (updated July 17, 2020), available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html

including in this district, have, therefore, granted compassionate release during the pandemic based in part or entirely on a person's obesity diagnosis.[54]

**_History of Hepatitis C._** Ms. Ford also has a history of hepatitis C infections, which presents unique dangers during the pandemic. Hepatitis C is an infectious disease, which primarily affects the liver. The CDC has recognized that certain chronic liver diseases may increase one's risk of severe illness from COVID-19.[55] Recent studies have shown that one such effect is that Hepatitis C "hijacks" immune regulators, leading to a significantly dulled immune response to viral infections."[56] Those suffering from compromised immune systems and liver problems are among the most vulnerable inmates in the prison population, because of their inherent inability to prevent the virus and/or serious illness if infected.[57] Indeed, courts have frequently granted compassionate release to those found to be immunocompromised including by Hepatitis C.[58]

---

[54] *See, e.g.*, *United States v. Blystone*, 14-CR-172-DAE, Doc. No. 522 (W.D. Tex. May 19, 2020) (the Government conceded that severe obesity alone could constitute an extraordinary and compelling reason); *United States v. Johnson*, --- F. Supp. 3d ---, 2020 WL 3041923 (D.D.C. May 16, 2020) (obesity and hypertension); *United States v. Ardila*, No. 3:03-CR-264-SRU, 2020 WL 2097736, at *2 (D. Conn. May 1, 2020); *United States v. Lacy*, No. 15-CR-30038-SEM, 2020 WL 2093363, at *6 (C.D. Ill. May 1, 2020) ("Besides obesity, Defendant suffers from hypertension and diabetes…Any one of these three factors alone would increase the serious risks of COVID-19[.]"); *United States v. Dawson*, No. 18-40085-HLT, 2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020); *United States v. Zukerman*451 F. Supp. 3d 329, 335-36 (S.D.N.Y. Apr. 3, 2020) (obesity and hypertension); *United States v. Rodriguez*, 451 F. Supp. 3d 392 (E.D. Pa. Apr. 1, 2020) (obesity and hypertension); *see also Basank v. Decker*, 449 F. Supp. 3d 205 (S.D.N.Y. Mar. 26, 2020) (ordering the release of aliens from immigration detention due to COVID-19 comorbidities, including obesity and hypertension); *United States v. Daugerdas*, --- F. Supp. 3d ---, 2020 WL 2097653, at *5 (S.D.N.Y. May 1, 2020) (recommending that BOP temporarily release defendant with obesity and hypertension).

[55] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Coronavirus Disease 2019: People with Certain Medical Conditions*, (updated Oct. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#liver-disease (last visited Oct. 23, 2020).

[56] TRINITY COLLEGE DUBLIN, *How hepatitis C 'ghosts' our immune system* (June 5, 2019), available at: https://www.sciencedaily.com/releases/2019/06/190605105940.htm.

[57] *See* CENTERS FOR DISEASE CONTROL AND PREVENTION, *Coronavirus Disease 2019 (COVID-19): People Who Are At Higher Risk*, available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (noting that people of all ages are at risk if they are immunocompromised, based on "cancer treatment, smoking, bone marrow or organ transplant, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications.").

[58] *See, e.g. United States v. Stephenson*, 461 F. Supp. 3d 864 (S.D. Iowa, May 21, 2020) (granting compassionate release to inmate suffering from Hepatitis C, based on the risks that COVID-19 present to somebody with a damaged liver and weakened immune system); *United States v. Peters*, No. 3:18-CR-188, 2020 WL 2092617 (D. Conn. May

*Multiple conditions.* The CDC also recognizes "[t]he more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19."[59] It explains that those suffering from three or more recognized conditions are five times more likely to be hospitalized than their healthy counterparts.[60] Numerous courts in the Western District of Texas have granted compassionate release to inmates with similar combinations of conditions to Ms. Ford.[61] Because of Ms. Ford's co-occurring medical conditions, she is at a significantly greater risk than if she simply suffered from one condition.

Ms. Ford's serious health conditions, as detailed above, and the unique risks posed by her incarceration at Carswell FMC constitute extraordinary and compelling reasons for compassionate release.

---

1, 2020) (granting compassionate release in light of COVID-19 and unnamed health conditions rendering him immunocompromised);*United States v. Park*, 456 F. Supp. 3d 557 (S.D.N.Y. Apr. 24, 2020) (granting compassionate release in light of COVID-19 and defendant's underlying health conditions of asthma and immunocompromising diseases); *United States v. Jepsen*, 451 F. Supp. 3d 242 (D. Conn. Apr. 1, 2020) (releasing and inmate, finding his chronic conditions and the fact that he is immunocompromised are extraordinary and compelling);

[59] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited Oct. 26, 2020).

[60] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Covid-19 Associated Hospitalization Related to Underlying Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/images/covid-data/hospitalization-underlying-medical-conditions-sm.jpg (last visited Oct. 28, 2020).

[61] *See e.g.*, *United States v. King*, No. 5:13-CR-836-FB, Doc. 202 (W.D. Tex. June 11, 2020) (granting compassionate release to inmate suffering from renal failure, nephrogenic systemic fibrosis, hypertension, and cardiomyopathy); *United States v Ennis*, EP-02-CR-1430-PRM-1, 2020 WL 2513109 (W.D. Tex., June 14, 2020) (granting compassionate release to defendant suffering from hypertension, diabetes, obesity, and a degenerative spine disorder); *United States v. Ramirez*, 3:08-CR-2277-DCG, 2020 WL 4199712 (W.D. Tex. July 20, 2020) (granting compassionate release to inmate suffering from hypertension, diabetes, and kidney disease); *United States v. Cardenas*, 5:91-CR-359-OLG, Doc. 84 (W.D. Tex. July 17, 2020) (granting compassionate release to inmate suffering from hypertension, obesity, diabetes, and hepatitis C).

2. *Ms. Ford suffers from serious medical conditions and she cannot care for herself in the prison environment, especially in light of COVID-19.*

Ms. Ford also satisfies the express provisions of the Sentencing Guidelines for release, because she suffers from serious medical conditions which substantially diminish her ability to provide self-care. *See* U.S.S.G. §1B1.13, comment. n.1(A) (ii)(I).

On May 18, 2020, the Department of Justice issued Guidance to U.S. Attorney's Offices that, where inmates suffer from documentable chronic medical conditions that are recognized by the CDC to place him or her at greater risk from COVID-19, the Government should not oppose a finding of "extraordinary and compelling reasons" under U.S.S.G. §1B1.13, comment. n.1(A) (ii)(I).[62]

Type 2 diabetes, hypertension, obesity, and Ms. Ford's history of hepatitis C infections are all serious conditions, in light of the COVID-19 pandemic, and numerous of them are recognized as such by the CDC. The conditions affect her immune, respiratory, and cardiovascular systems. Experts warn these conditions could increase the risk of contracting COVID-19 or suffering serious illness as a result. Moreover, the conditions in a prison make social distancing impossible. During the pandemic, courts have recognized that an inability to socially distance or otherwise protect oneself in prison can constitute an inability to "self-care."[63] And numerous of these

---

[62] *See* Letter Amending Government's Response, *United States v. Wise*, 1:18-cr-00072-ELH, Doc. No. 185 (D.Md. May 18, 2020) ("Undersigned counsel has been informed that the Department of Justice has taken the position that inmates who suffer from a condition identified by the Centers for Disease Control and Prevention ('CDC') as putting them at higher risk for severe illness from COVID-19 and who are not expected to recover from that condition, present an 'extraordinary and compelling reason' to be considered for compassionate release—even if that condition in ordinary times would not meet the terms of the policy statement.").

[63] *See United States v. Pomante*, No. 19-CR-20316-DPH, 2020 WL 2513095 (E.D. Mich. May 15, 2020) ("The Court finds that Defendant's condition is serious and the inability to effectively practice social distancing in prison diminishes Defendant's ability to provide self-care for his medical conditions."); *United States v. Perez*, 451 F. Supp. 3d 288, 293-94 (S.D.N.Y. Apr. 1, 2020) (granting compassionate release under U.S.S.G. §1B1.13, comment. n.1(A)(ii)(I), and finding "[c]onfined to a small cell where social distancing is impossible, Perez cannot provide self-care because he cannot protect himself from the spread of a dangerous and highly contagious virus."); *United States v. Colvin*, No. 3:19-CR-179-JBA, 2020 WL 1613943 (D. Conn. Apr. 2, 2020) ("Defendant is unable to provide self-care within the environment of FDC Philadelphia in light of the ongoing and growing COVID-19 pandemic because

conditions, particularly diabetes, are treatable, but not curable, so the risks created will persist indefinitely.

Ms. Ford has shown that she suffers from a "serious medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover." *See* U.S.S.G. §1B1.13, comment. n.1(A)(ii)(I). Therefore, her medical conditions and her incarceration during the COVID-19 pandemic present extraordinary and compelling circumstances justifying compassionate release under § 3582(c)(1)(A).

**C. Consideration of the § 3553(a) sentencing factors—including the non-violent nature of the offense, the amount of time served, and Ms. Ford's positive rehabilitation at BOP—favors a sentence reduction.**

Under § 3582(c)(1)(A)(i), when a defendant establishes the existence of extraordinary and compelling circumstances justifying compassionate release, courts must consider the relevant 18 U.S.C. § 3553(a) sentencing factors to determine whether a sentencing reduction or modification is warranted. Here, § 3553(a) factors warrant a sentence reduction, especially in light of Ms. Ford's numerous health concerns. Ms. Ford has served over 5 years, or roughly 60% of her expected sentence, for a non-violent drug offense, during which time she has been a model inmate. She has programmed extensively, received positive evaluations for her work, and has received only one minor disciplinary mark (for possessing a non-hazardous tool) during her incarceration. She has renewed her religious faith and used her time in prison to focus on her recovery from addiction. She is now sober and rehabilitated and is prepared to reenter society. Given her serious medical issues and her efforts to address those issues which contributed to her past non-violent criminal

---

she is unable to practice effective social distancing and hygiene to minimize her risk of exposure, and if she did develop complications, she would be unable to access her team of doctors at Bridgeport Hospital.").

behavior, the time Ms. Ford has served is more than sufficient to reflect the severity of her underlying criminal conduct.

  ***Defendant's History and Characteristics***. Ms. Ford was born in Yakima, Washington in 1983, to Coy Lee Ford and Angela Youngblood. *See* PSR, Doc. No. 31 at ¶ 44. As a young child, she relocated with her family to Compton, Arkansas, where she was raised. *Id.* at ¶¶ 45-46. She reports having a stable upbringing with no significant problems. *Id*. She dropped out of High School after 10th grade, but obtained her G.E.D. in 2000, and earned college credit hours at North Arkansas Technical College in Harrison, Arkansas. *Id*. at ¶ 53. Her father has since deceased, and her mother and two sisters, Cindy and Melissa, all live in Arkansas. *Id*. at ¶¶ 45-46.

  Ms. Ford reportedly began experimenting with drugs around the age of 17, starting with marijuana and methamphetamine. *See* PSR, Doc. No. 31 at ¶ 51. By the age of 23, she was using methamphetamine daily, and participated in multiple inpatient and outpatient drug treatment programs in 2013 and 2014. *Id*. Still, at the time of her arrest in 2015 for the underlying offense, Ms. Ford admitted that she continued to struggle with addiction to methamphetamine. *Id*.

  ***Offense and Sentence***. Ms. Ford's present offense involved importing methamphetamine in September of 2015. While her offense was serious, it did not involve violence, nor did any of her prior offenses. Ms. Ford was assigned an offense level of 37 and a criminal history category of VI, based on her qualifying as a career offender, but Probation recommended the statutory maximum sentence of 240 months. *See* PSR, Doc. No. 31 at ¶¶ 59-60. The Government, however, filed a Sentencing Memorandum on Ms. Ford's behalf, arguing the recommended sentence was disproportionately high because of Ms. Ford's minimal role in the offense and her sincere attempts to assist the Government in pursuing other offenders. *See* Doc No. 33. On March 10, 2016, the

Court accepted the Government's recommendation, and sentenced Ms. Ford to a term of 120 months' incarceration. Doc. No. 35.

*Post-Sentencing Rehabilitation.* Ms. Ford has been a model inmate during her 5-year period of incarceration. As explained in her Progress Report, BOP recognizes that Ms. Ford has "completed an extensive amount of programs and classes offered through the education and recreation departments." *See* Exhibit 2, Progress Report. Since 2017, she has been assigned to work in the "Base Support Detail and she receives good evaluations from her supervisor." *Id*. The job entails providing janitorial and groundskeeping support to Naval Air Station Fort Worth, Joint Reserve Base, and she received a letter in 2019 from the Base's Commanding Officer, recognizing her dedication and hard work. *See* Exhibit 4, J.R. Townsend Letter. She has also received training for and been certified to operate equipment for this work. *See* Exhibit 5, Training Certification / Operator Permit. Ms. Ford is classified as a "minimum" security level, and has had only one minor disciplinary incident, for possession of a non-hazardous tool, during her incarceration, and has "maintained clear contact since 2018" and is "not viewed as a management concern." *Id*. [64]

Ms. Ford has also used her time in prison to focus on her recovery from substance abuse and her devotion to her religious faith. She completed BOP's drug education program in 2017 and participated in a non-residential drug counseling program in 2019. *See* Exhibit 2, Progress Report. As she explains in a letter to the Court:

> My whole adult life drugs ruled my thoughts, my actions, and perpetually took my freedom. Since initial incarceration I have taken and passed all programs offered to me. The most significant and meaningful courses involved a healing component from the disease

---

[64] Ms. Ford's Progress Report incorrectly notes that she has an active misdemeanor warrant with the Harrison Police Department in Arkansas. *See* Exhibit 2, Progress Report. Ms. Ford has, however, obtained a letter from the Harrison Police Department documenting that it holds no active warrants or detainers for her as of March of 2020. *See* Exhibit 6, Harrison Police Department Letter.

of addiction. I've learned the importance of discernment when critical or even basic decisions need to be made.

*See* Exhibit 7, Katy Ford Letter to the Court. She further explains that, when she was first incarcerated, she "struggled with obsessive thoughts about doing drugs, not doing drugs, or drinking alcohol." *Id*. She credits her sobriety not only to drug education, but to her renewed religious faith. As she explains "My spiritual path began with church services weekly, then grew into recovery course and is currently the aspect of my life that completes me through biblical principles, healthy relationships, and holy worship." *Id*.

Ms. Ford's change in outlook and rehabilitation have been recognized by her mother, Angela Youngblood, her sister, Cindy Conklin, and her cousin, Latisha Cook, all of whom have written letters to the Court on her behalf. *See* Exhibits 8, 9, 10. Ms. Cook notes in her letter that "I feel with all of my heart that she is a fantastic candidate [for compassionate release]. Katy has grown tremendously while incarcerated, not only in terms of her sobriety, but her Spirituality, self-worth, self-esteem, and work ethic." *See* Exhibit 8, Latisha Cook Letter. Ms. Conklin likewise recognized a change in her sister, noting she recognized Ms. Ford's growth when she admitted knowing that she needed to be in prison, and that "prison was her salvation." *See* Exhibit 9, Cindy Conklin Letter. Finally, her mother, Ms. Youngblood, explains that she has witnessed dramatic changes to Ms. Ford, particularly in her spirituality and her respect for her family. *See* Exhibit 10, Angela Youngblood Letter.

***Viable Reentry Plan***. Upon release, Ms. Ford plans to live with her mother, Ms. Youngblood, in Harrison, Arkansas. Ms. Youngblood can provide a stable environment for Ms. Ford and can help to manage her medical issues. She has a four-bedroom home, with plenty of room for Ms. Ford to live and quarantine if necessary. *See* Exhibit 10, Angela Youngblood Letter. Ms. Ford is no longer in touch with the criminal elements with whom she used to consort. Rather,

she now has an extensive and loving network of family and friends in Arkansas, many of whom have expressed interest in helping her financially, or with counseling, or with finding a job when she is released. *See* Exhibits 8, 9, 10. Ms. Ford has spoken with her mother about possible employment at Tyson's, Pace, or Claridge, and Ms. Youngblood is prepared to help her with job applications. *See* Exhibit 10, Angela Youngblood Letter.

*Deterrence and Public Protection*. Ms. Ford has served roughly 60% of her expected criminal sentence for a non-violent crime, during which time she has shown considerable rehabilitation by maintaining a clean disciplinary record, working hard in her prison employment, participating in educational programming, working on and maintaining her drug treatment and sobriety, and renewing her faith as a means towards personal growth. Ms. Ford's criminal history appears to be the result of her substance abuse problems, as she occasionally participated in the manufacture or trafficking of narcotics, or engaged in other unlawful conduct, as a means of supporting her methamphetamine habit. Now that she has served the majority of her sentence and gained additional tools through drug treatment programming to stay clean once released, Ms. Ford is prepared to rejoin society.

Now, Ms. Ford's incarceration serves only to further crowd the prison system when experts are advocating for a decrease in prison population to mitigate the spread of COVID-19.[65] Attorney General Barr issued a memorandum to BOP to heed expert advice and release to home confinement

---

[65] *See e.g.* John Pfaff, Executive Summary, *Local Officials Should Quickly Reduce Jail Populations to Slow the Spread of the Coronavirus* (Apr. 2020), http://filesforprogress.org/memos/reducing-jail-populations-coronavirus.pdf; Joseph A. Bick, I*nfection Control in Jails and Prisons*, CLINICAL INFECTIOUS DISEASES 45(8): 1047-1055 (2007), available at *https://doi.org/10.1086/521910*; VICE, *Sick Staff, Inmate Transfers, and No Tests: How the U.S. is Failing Federal Inmates as Coronavirus Hits* (Mar. 24, 2020), available at https://www.vice.com/_en_us/_article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits; Letter of Representatives Jerrold Nadler and Karen Bass (March 19, 2020), https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/5.24.18%20hjc%20dems%20letter%20to%20potus.pdf ("DOJ and BOP must also do all they can to release as many people as possible who are currently behind bars and at risk of getting sick. Pursuant to 18 U.S.C. 3582(c)(1)(A), the Director of the Bureau of Prisons may move the court to reduce an inmate's term of imprisonment for "extraordinary and compelling reasons.").

not just the elderly, but also those who have had good behavior in BOP, are at a high-risk of becoming infected with COVID-19, have served significant portions of their sentence, and are a low-risk to the community.[66] BOP has been directed to reduce the overall prison population, by focusing on inmates precisely like Ms. Ford. She is not only at a high-risk for contracting the virus and falling fatally ill, she is a low-risk to the community, which warrants compassionate release.

A reduction or modification of Ms. Ford's sentence would not diminish the seriousness of the offense, nor would it place the public in any danger. The extraordinary and compelling circumstances presented by her incarceration at FMC Carswell—compounded by the heightened risks faced by Mr. Ford, whose ability to engage in basic self-protective measures is restricted— warrant a reduced and/or modified sentence.

## Conclusion

For the reasons stated above, Ms. Ford asks the Court to reduce her sentence to time-served or modify her sentence to allow her to serve the remainder of her sentence on home confinement.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender


/s/
REGINALDO TREJO, JR.
Supervisory Assistant Public Defender
Western District of Texas
Richard C. White Federal Building
700 E. San Antonio, D-401
El Paso, Texas  79901
(915) 534-6525
*Attorney for Defendant*

---

[66] William Barr, United States Attorney General, *Memorandum for Director of Bureau of Prisons* (Mar. 26, 2020), available at https://www.justice.gov/file/1262731/download.

**CERTIFICATE OF SERVICE**

I certify that on the 18th day of November, 2020, I electronically filed the foregoing Katy

Lynn Ford's Motion for Sentence Reduction Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) with the

Clerk of Court using the CM/ECF system and I will send notification of such filing to:

Kyle Myers
Assistant United States Attorney
700 E. San Antonio, Ste. 200
El Paso, Texas  79901

/s/ REGINALDO TREJO, JR.
*Attorney for Defendant*

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| | § | |
| **V.** | § | **3:15-CR-01851-DCG-01** |
| | § | |
| | § | |
| **KATY LYNN FORD** | § | |

**ORDER**

The Court considers this case under its authority under 18 U.S.C. § 3582(c)(1)(A)(i) and

Federal Rule of Criminal Procedure 43(b)(4). Having considered Defendant's Motion for Sentence

Reduction and the sentencing factors in 18 U.S.C. § 3553(a), the Court finds that the extraordinary

and compelling circumstances presented by the global pandemic of COVID-19, combined with

the Defendant's low-risk of danger to the community, warrant her immediate release.

Accordingly, the Court **ORDERS**:

(1)     Defendant's Motion for Compassionate Release is **GRANTED**;

(2)     Defendant's 120-month sentence of imprisonment is reduced to time-served;

(3)     Defendant's terms and conditions of supervised release are modified to include

_____ of home confinement.

(4)     All other terms and provisions of the original judgment remain in effect.

(5)     A copy of this order shall be transmitted to the Bureau of Prisons immediately.

**SO ORDERED** on this the _____ day of _____, 2020.

_____
DAVID C. GUADERRAMA
United States District Judge